357 P.2d 126

CALIFORNIA COTTON OIL CORPORA-
TION, a California corporation, and Cali-
fornia Cotton Credit Company, a Califor-
nia corporation, Appellants,

v.

Fay RABB, George M. Hill and George H.
Rawlins, copartners, doing business under
the name of Hope Farms Company, Ap-
pellees.

No. 6677.

Supreme Court of Arizona.

Nov. 17, 1960.

A. J. Eddy and Westover, Mansfield,
Westover & Copple, Yuma, for appellants.

Rawlins, Davis, Christy, Kleinman &
Burrus and Shimmel, Hill, Cavanagh &
Kleindienst, Phoenix, for appellees.

LESHER, Justice.

This is an action for breach of contract.
From a judgment for the plaintiffs below,
defendants appeal.

Plaintiffs were the owners of a certain cotton farm located in Yuma County. They leased it to one Weaver for the crop year 1953–1954, under an arrangement by which they were to share equally with Weaver in the net crop income. In that lease plaintiffs agreed to subordinate, or "waive", their lien on the crop to enable Weaver to obtain crop financing. On March 11, 1953, one of the plaintiffs, Mr. Rabb, met with Weaver and a Mr. Frost to arrange for financing of the crop. Frost was the manager of the C. & F. Gin Company, and is alleged for the purposes of the ensuing transactions to have been the agent of the defendants.

On that same day three documents were drawn. One, signed by Weaver, was a crop mortgage running to defendant California Cotton Credit Company. A second, executed by Rabb in accordance with his lease agreement with Weaver, was a crop lien waiver. The third was called a "Crop Budget", and is set out in full below:

California Cotton Credit Company  
Los Angeles, California  
No. 53201

**Crop Budget**  
(Prepare Separate Budget For Each Crop)

Applicant estimates that $49,005.00 will be required for the purposes set forth below in connection with the production of 600 net acres of cotton.

**Months**  
(Show Amounts in Dollars Only)

| EXPENSE | Per Acre | Total | Feb. | March | April | May | June | July | Aug. | Sept. | Oct. | Nov. | Dec. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Leveling | 8.0 | 4800 | | 4800 | | | | | | | | | |
| 2. Plowing, Discing, etc. | | | | | | | | | | | | | |
| 3. Stalk Cutting | | | | | | | | | | | | | |
| 4. Cultivating | 5.0 | 3000 | | | | 1000 | 1000 | 1000 | | | | | |
| 5. Chopping | 5.0 | 3000 | | | | 750 | 750 | 750 | 750 | | | | |
| 6. Planting | | | | | | | | | | | | | |
| 7. Seed | 1.6 | 1125 | | | 1125 | | | | | | | | |
| 8. Irrigating (labor) | 3.8 | 2100 | | | 350 | 350 | 350 | 350 | 350 | 350 | | | |
| 9. Fertilizer | 10. | 6000 | | 6000 | | | | | | | | | |
| 10. Hay, Gas and Oil | | | | | | | | | | | | | |
| 11. Living Expense | | 2100 | | | 350 | 350 | 350 | 350 | 350 | 350 | | | |
| 12. Power, Water | 28.5 | 17100 | | | 2850 | 2850 | 2850 | 2850 | 2850 | 2850 | | | |
| 13. Dusting | 16.3 | 9780 | | | | 3260 | 3260 | 3260 | | | | | |
| 14. | | | | | | | | | | | | | |
| 15. | | | | | | | | | | | | | |
| Total Production Costs | | 49005 | | 10800 | 4675 | 8560 | 8560 | 8560 | 4300 | 3550 | | | |
| 16. Land Payments | | | | | | | | | | | | | |
| 17. Implement Payments | | | | | | | | | | | | | |
| 18. Taxes, Interest | | | | | | | | | | | | | |
| Total Pre-Harvest Costs | | 49005 | | 10800 | 4675 | 8560 | 8560 | 8560 | 4300 | 3550 | | | |
| Total Cost per Acre | | 81.67 | | | | | | | | | | | |

Budget Approved:

"Field Inspector"

"Applicant"

Rabb testified that before he signed the waiver he heard Frost tell Weaver that the Crop Budget was inflexible, and that money would be paid and advanced only according to its terms.

Following the close of the crop year, this action was brought. Plaintiffs alleged that defendants made advances to Weaver in excess of those contemplated in the budget, and at times different from those scheduled in the budget, causing plaintiffs ultimately to receive less in their final settlement with Weaver than they would otherwise have received. The essential question before the Court is, therefore, this: Was the so-called "Crop Budget" made a contract between these plaintiffs and defendants, so that deviation from the budget would give rise to a cause of action in plaintiffs for its breach? Clearly it was not a written contract between these parties; it was never signed by anyone. Plaintiffs' theory, however, appears to be that there was an oral agreement between Frost and Rabb that: (1) plaintiffs would execute the waiver, in return for which, (2) defendants would limit all advances to Weaver to those prescribed by the budget.

Mr. Rabb was the only person testifying to the events of March 11. While there are many pages of the transcript reflecting the period over which he was on the witness stand, most of it is devoted to colloquy between the court and counsel, and there are only fragments which are in any way helpful in resolving the question presented here. The questions and answers which most closely bear on it are these:

"Q. Tell us what transpired there? A. I am trying to tell you that the conversation between Mr. Frost and Mr. Weaver in regards to each item here that had to be certain, a part of this money set up for electricity, certain part of it for plowing and a certain part for living expenses and that was agreed to before I signed the waiver.

\*     \*     \*     \*     \*     \*

"Q. Calling your attention to Exhibit A in evidence, can you tell me what was said about each item on that budget with relation to the amount and when it would be expended and who said it? A. Mr. Frost told him the way the budget was set up the first of each month, that the money would be deposited to their account and that he would give his check to Mr. Weaver and the budget could not be overdrawn except just as it is drawn up the first of each month and if it was $15,000.00 due the first of the month it was set up in there to be transferred to their account and the C & F Gin Company would give Weaver their check for that amount.

\*     \*     \*     \*     \*     \*

"Q. What did Mr. Frost say with relation to agreeing to advance funds

of ever specific item on the budget? A. Mr. Frost said as soon as his budget was approved that he would take—take each month's item and it would have to be—every check would have to be drawn in accordance with the amount and the month, the first of each month or about that, and that is the way; it could not be overdrawn at the time, any item."

The foregoing testimony, fragmentary as it is, constitutes substantially all of the evidence adduced on the oral contract question. The conversation appears to have been altogether one-sided, consisting principally of statements by Frost to Weaver that the latter could expect no advances not specified in the budget. Rabb does not appear to have entered into the conversation at all. There is no evidence whatever that Frost ever promised Rabb that the budget—which is labeled an "estimate"—would be adhered to. Rabb testified in substance that he relied on the statements made by Frost to Weaver when he executed the lien waiver. Nevertheless, it is clear from all of the evidence that the waiver was in fact executed—as it had to be—in compliance with and as a part of Rabb's lease agreement with Weaver, and not in the context of any contractual relationship with Frost and the defendants. In short, the record is barren of any evidence showing the alleged oral agreement between plaintiffs and defendants on which plaintiffs rely. Nor does the signed waiver help the plaintiffs. It recites that it is executed by plaintiffs in consideration of the acceptance by defendants of a crop mortgage from Weaver, which mortgage was in fact given to defendants as security for the crop financing loans. It makes no reference to the budget. It contains no language which would tend to establish any contract between defendants and these plaintiffs that money would be paid or advanced in any certain way or at any certain times.

If there was no oral contract between plaintiffs and defendants limiting payments to Weaver to the amounts and times shown in the budget, this question remains: Was the budget itself a contract between defendants and Weaver of which these plaintiffs were third-party beneficiaries entitled to sue for its breach? The essentials of a contract enforceable by others than the parties thereto have been defined by this Court in a line of cases, the most recent of which is Irwin v. Murphey, 81 Ariz. 148, 302 P.2d 534, 538. As this Court therein stated:

"Under the law as laid down by this court and which we feel is stare decisis, it definitely must appear that the parties intend to recognize the third party as the primary party in interest and, as privy to the promise, in order for the third party to recover."

**380**

If the so-called "Crop Budget" is a contract between defendants and Weaver—and it should be emphasized that we do not pass on this question—it clearly is not such a contract as clothes anybody else with the right to sue for its breach. It is at most an agreement between defendants and Weaver that the money agreed to be advanced to him would not be advanced save in certain amounts, at certain times, for certain purposes. The money was to go to finance the crop which was the defendants' only security for its loans. Viewed in the light of those circumstances, the budget appears to be primarily a devise by which defendants assured themselves that the money they advanced would in fact go into the crop on which they relied for their repayment. In other words, if it is a contract, it is one which is clearly for the benefit of the parties to it—Weaver, who is assured of advances when he needs them, and defendants, who are assured that the advances will not go into Weaver's own pocket. There is nothing, either in the budget itself or extrinsic to it in the circumstances of its adoption, to show any intent that any other parties, including these plaintiffs, are primarily to be benefited by it. Such benefit as plaintiffs may derive are wholly incidental, and in Arizona incidental benefit does not support an action for breach of contract. Irwin v. Murphey, supra.

In summary, the budget was not the subject of any contract between these plaintiffs and defendants. Neither was it a contract between defendants and Weaver for breach of which these plaintiffs could sue.

Our conclusion makes it unnecessary for us to consider the remaining assignments of error. The judgment is reversed, and the trial court instructed to enter judgment for the defendants.

STRUCKMEYER, C. J., and PHELPS, BERNSTEIN and UDALL, JJ., concur.